UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| KIMBERLY D. BUCHANAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:15-cv-202-TAV-CCS |
| v. ) | |
| ) | |
| SUN LIFE HEALTH INSURANCE COMPANY, ) | |
| (US) ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 16] of the Chief District Judge.

Now before the Court is Defendant's Motion for Summary Judgment [Doc. 17] and the Plaintiff's Motion for Judgment on the Administrative Record [Doc. 19]. The parties appeared before the Court for for a motion hearing on January 11, 2017. Attorney John Dupree was present on behalf of the Plaintiff, and Attorney Brandon Cate appeared on behalf of the Defendant. For the reasons stated herein, the undersigned will **RECOMMEND** that the Defendant's Motion for Summary Judgment on the ERISA Record [**Doc. 17**] be **GRANTED** and that the Plaintiff's Motion for Judgment on the Record [**Doc. 19**] be **DENIED**.

Plaintiff Kimberly D. Buchanan brought this action against Defendant Sun Life and Health Insurance Company, U.S., alleging that she became totally disabled under the terms of the policy due to complications from a severe medical condition and thus was entitled to benefits thereunder. In her Complaint, the Plaintiff alleges breach of contract and/or fiduciary duty, and she requests specific performance with respect to the terms of the long-term disability policy. The Complaint

was originally filed in Knox County Chancery Court but was removed [Doc. 1] on the basis that the action is governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

## I. BACKGROUND

The facts relevant to the parties' Motions for Judgment are as follows.

### A. The Policy Provisions

GE Group Life Assurance Company issued a Group Insurance Policy ("Policy") to Bella Boutique with an effective date of December 1, 2004. [Doc. 9-5 at 64]. The Policy provides coverage to "all active full-time employees who satisfy the coverage eligibility requirements . . ." [Doc. 9-5 at 65]. In order to qualify as an "active full-time employee," the following criteria must be met:

> 1. Working at your Employer's usual place of business or such place or places as the Employer's normal course of business may require; and
>
> 2. A United States citizen or resident working within the United States; and
>
> 3. Performing all of the duties of your job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week unless otherwise stated in the Insurance Schedule; and
>
> 4. Paid for such work in accordance with applicable Wage and Hour Laws; and
>
> 5. Not a seasonal or temporary employee; that is, an employee whose annual work schedule is less than 12 months during a calendar year.

[Doc. 9-5 at 68]. Further, the Policy defines "Total Disability and Totally Disabled" as follows:

> Total Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Totally Disabled if:

2

Case 3:15-cv-00202-TAV-CCS   Document 31   Filed 02/01/17   Page 2 of 19   PageID #: 1433

1. During the Elimination Period and the following 24 months, you are unable to perform all the material and substantial duties of your Regular Occupation.

2. After the Elimination Period and the following 24 months, you are unable to perform the duties of Any Occupation.

[Doc. 9-5 at 73]. In addition, the Policy explains "Partial Disability and Partially Disabled" as follows:

A Partial Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Partially Disabled if:

1. During the Elimination Period and the following 24 months you are:
   a) Unable to perform all the material and substantial duties of your Regular Occupation;
   b) Performing at least one of the material duties of your Regular or Any Occupation on a Full-Time Basis or Part-time basis; and
   c) Earning at least 20% less than your Pre-Disability Earnings immediately prior to the onset of Disability and there is a Demonstrated Relationship between this earnings loss and your current Disability.

2. After the Elimination Period and the following 24 months, you are:

   a) Unable to perform the duties of Any Occupation; and
   b) Performing at least one of the material duties of your Regular or Any Occupation on a Full-time Basis or Part-time Basis.

[Doc 9-5 at 73]. Further, the Policy defines "Basic Monthly Earnings" as

[Y]our gross monthly rate of earnings from your Employer in effect prior to your Period of Disability. It includes employee pre-tax contributions to a deferred compensation plan which is defined by a documented, pre-determined formal. It does not include:

1. Commissions;
2. Bonuses;
3. Overtime pay;
4. Any other fringe benefit or extra compensation.

3

> For purposes of determining "Basic Monthly Earnings," if you are an hourly employee, your monthly pay will be based on a work week of no more than 40 hours.

[Doc. 9-5 at 68]. Finally, the Policy provides:

> GE Group Life Assurance Company is a fiduciary, as the term is used in ERISA and the regulations which interpret ERISA, with respect to insurance policies under which you, and if applicable, your dependents are insured. In this capacity, we are charged with the obligation, and possess discretionary authority to make claim, eligibility and other administrative determinations regarding those policies, and to interpret the meaning of their terms and language.
>
> GE Group Life Assurance Company, as Claims Fiduciary, shall have the sole and exclusive direction and authority to carry out all actions involving claims procedures explained in the Policy. The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits, and construe any and all issues relating to eligible for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be distributed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner. . .

[Doc. 9-5 at 100].

Later, the Policy was amended, to state that "Sun Life and Health Insurance Company (U.S.) as Claims Fiduciary, shall have the sole and exclusive discretion and authority to carry out all actions involving claims procedures explained in the Policy." [Doc. 9-6 at 100].[1]

### B. The Procedural History

*(a) The Plaintiff's Request for Benefits*

The Plaintiff completed an application for long-term disability benefits on August 14, 2011. [Doc. 9-4 at 82]. In her application, the Plaintiff explained that she was the owner of Bella Boutique and that her regularly scheduled work week was 6 to 7 days per week and 40 to 60 hours per week. [Doc. 9-4 at 84]. The Plaintiff stated that she had not worked since May 2010. [Doc. 9-

---

[1] It is not entirely clear when the Policy was amended, but the Sun Life certificate notes that the last printed date was June 12, 2013. [Doc. 9-12 at 67], which was after the initial claim determination on February 14, 2012.

4 at 84]. In the job description, the Plaintiff stated, "Being the owner[,] I do everything in the store. Over all employees, billing, sales and the operation of store." [Doc. 9-4 at 85].

By letter dated February 14, 2012, the Defendant denied the Plaintiff's claim. [Doc. 9-6 at 6].[2] The letter provided the definitions of certain terms contained in the Policy and summarized the background of the claim. [Doc. 9-6 at 11]. The Defendant noted that it had received the Plaintiff's application almost eighteen months after the Plaintiff's claimed period of disability. [Doc. 9-6 at 11]. In addition, the Defendant noted:

> You stated that neither you nor you[r] spouse clock in or out. During prom season (December through May), you indicated you both work 40-70 hours a week and in the off season you work 40-50 hours per week, however you cannot provide anything to document the dates or time you worked. You also stated that neither you nor your spouse takes a paycheck or any type of salary draw. You stated that you pay all of your bills through the store and that this arrangement was set up through your accountant.

[Doc. 9-6 at 11]. Further, in the letter, the Defendant explained that it spoke to the Plaintiff on January 18, 2012, and that the Defendant advised the Plaintiff at that time that the Policy was an income replacement policy and that if the Plaintiff did not have income to be replaced, there was no claim. [Doc. 9-6 at 11-12]. The Defendant noted that it spoke with the Plaintiff's accountant at the request of the Plaintiff and that the accountant confirmed that all income had been set up as the Plaintiff's husband's income. [Doc. 9-6 at 11-12]. In addition, the letter explained that the accountant faxed a note on January 24, 2012, stating that Bella Boutique was a Schedule C business on the Plaintiff's and her husband's joint federal tax return and that all income was allocated to Plaintiff's husband instead of being allocated 50:50. [Doc. 9-6 at 12]. The Defendant concluded:

> Based on the available information received to date, you do not qualify as an Active Full-time Employee as defined by this policy. To date[,] you have been unable to supply us with documentation

---

[2] The letter also explains that Sun Life and Health Insurance Company (U.S.) was formerly known as Genworth Life and Health Insurance Company.

> that you were working at least 30 hours per week and being compensated for that work. Additionally, although we have received a substantial amount of your medical records, we have not received documentation of medical care at the time of your claimed May 10, 2010 disability cease work.
>
> This is an income replacement policy based on your gross monthly rate of earnings from your employer in effect prior to your period of disability. As you were not compensated for the work that you performed, you do not qualify as an Active Full-time employee of the company and therefore are not eligible for the Long Term Disability coverage. In taking this position and denying your claim, we reserve all rights and defenses available to us.

[Doc. 9-6 at 12-13]. The Defendant stated that the Plaintiff had 180 days to appeal. [Doc. 9-6 at 13].

*(b) The Plaintiff's First Appeal*

The Plaintiff submitted an appeal dated May 24, 2013. [Doc. 9-9 at 96]. Although the Defendant noted that the Plaintiff's appeal was untimely, it decided to consider additional proof relative to active full-time employees and proof of loss. [Doc. 9-9 at 97]. In a letter dated June 12, 2013, the Plaintiff stated that her primary responsibility was to purchase dresses and accessories for the store and that additional duties included bookkeeping and accounting. [Doc. 9-10 at 54]. She explained that bookkeeping involved writing all business checks; paying all vendors invoices in a timely manner and making sure they are correct and if there was a credit against an invoice making sure it is applied; and tracking all market orders, special orders, duplicate invoices and business performances. [Doc. 9-10 at 54]. Further, on June 12, 2013, the Defendant noted that it had "corrected the definition for Long Term Disability coverage to the Partnership, K1 calendar year for Plan 1." [Doc. 9-11 at 31]. The Defendant also noted that it had created a plan 2 with the standard definition of earnings for those employees who were not Partners. [Doc. 9-11 at 31]. Specifically, the Defendant added a definition of "Basic Month Earnings" for partners as follows:

6

> If you are a partner, your Basic Monthly Earnings will be calculated from the partnership federal income tax return as follows:
>
> 1. From the line which shows "net earnings (loss) from self-employment" from Schedule K-1 of the partnership income tax return (form 1065) for the calendar year prior to the date your Period of Disability begins; or
>
> 2. For the period that you were a partner if you were not a partner during the year for which the most recent partnership federal tax return was filed.
>
> It includes employee pre-tax contributions to a deferred compensation plan which is defined by a documented, pre-determined formula.

[Doc. 9-12 at 71].

To determine whether the Plaintiff satisfied the amended Policy requirements, the Defendant consulted with Jeffrey Bannon, a certified public accountant. [Doc. 9-10 at 9]. In a report dated September 10, 2013, Mr. Bannon noted:

> Ms. Buchanan's 2009 through 2011 income tax returns indicate that the income from her and her husband's business, Bella Boutique, was reported on Schedule C of their joint tax return. IRS regulations permit a husband and wife to report the income from a partnership between them on separate Schedule C's. The income attributable to each would be reported on their respective Schedule C which would preclude the need for the filing of a partnership tax return.
>
> The tax returns provided for Ms. Buchanan do not strictly adhere to the IRS regulations with respect to the filing of separate Schedule Cs's. The 2009 Schedule C was prepared as a joint Schedule C rather than 2 separate Scheduled C's. The income was divided evenly when calculating the Self-Employment tax (FICA/Medicare). In 2010, a joint Schedule C was filed for part of the year and a separate Schedule C was filed solely for Ms. Buchanan's husband, Thomas Buchanan. In 2011, a Schedule C which attributed all of the income to her husband was filed.

[Doc. 9-10 at 9]. Mr. Bannon opined, "A reasonable equivalent Basic Monthly Earnings definition for a joint Schedule C situation such as this would be to use the insured's 50% portion net income

7

of the joint Schedule C of the calendar year immediately prior to her date of disability. Based on a date of disability of May 11, 2010, Ms. Buchanan's Basic Monthly Earnings would be based on her income from calendar year 2009. Her 50% of the 2009 net income is $76,558. [Doc. 9-10 at 8]. Mr. Bannon calculated her maximum monthly benefit at $3,827.90. [Doc. 9-10 at 8].

Further, Mr. Bannon noted:

> Ms. Buchanan has submitted copies of the business bank statements and canceled checks from June 2009 through June 2013. There were approximately 110 to 120 checks clearing the bank each month. While it is not possible to determine her monthly Rehabilitative Earnings from the bank statements, the canceled checks do indicate that Ms. Buchanan has been continually involved in the operation of the business. This is clearly evidenced by the fact that the vast majority of the 110 to 120 monthly checks were signed by Ms. Buchanan. At a minimum, this reflects an ongoing financial/managerial participating in the business.

[Doc. 9-10 at 9-10]. Moreover, Mr. Bannon discussed whether the Plaintiff would be eligible for partial disability benefits. [Doc. 9-10 at 10]. Mr. Bannon stated that for partial disability purposes, the Plaintiff's monthly earnings should be based on her 50% share of the net income of the business. [Doc. 9-10 at 10]. Mr. Bannon stated that her average monthly earnings in 2010 was $7,349.46 and in 2011, it was $10,893.33. [Doc. 9-10 at 10]. Mr. Bannon concluded, "Both of these amounts exceed [the Plaintiff's] Basic Monthly Earnings as calculated above. Accordingly, she would not have qualified as Partially Disabled in 2010 or 2011 and would not be eligible for benefits." [Doc. 9-10 at 10].

On September 24, 2013, the Defendant affirmed its denial. [Doc. 9-9 at 94]. The Defendant noted that the Plaintiff did not meet the following: (1) active full-time employee in an eligible class leading up to the claimed May 11, 2010 cease work date; (2) totally disabled or partially disabled, as of the claimed May 11, 2010 disability cease work date; and (3) totally or partially disabled throughout the 90-day elimination period, and beyond. [Doc. 9-9 at 94]. The Defendant

8

summarized the procedural history and the definitions contained in the Policy. [Doc. 9-9 at 94-110, Docs. 9-10 at 1-6]. The Defendant noted that the Plaintiff submitted copies of the business bank statements and cancelled checks from June 2009 through June 2013 and that there were approximately 110 to 120 checks clearing the bank each month. [Doc. 9-9 at 98]. The Defendant noted that the canceled checks indicated that the Plaintiff was continually involved in the operation of the business because the vast majority of the 110 to 120 monthly checks were signed by the Plaintiff. [Doc. 9-9 at 98]. The Defendant stated that "[a]t a minimum, this reflects an ongoing financial managerial participation in the business." [Doc. 9-9 at 98]. The Defendant also explained that the Plaintiff did not meet the criteria for partial disability benefits. [Doc. 9-9 at 98]. Further, the Defendant noted that with respect to determining active-full time employee status, the only business and financial document received were Bella Boutique Accounts Payable Check copies signed by the Plaintiff suggesting that she was performing this function. [Doc. 9-10 at 5]. The Defendant also noted that the Plaintiff, her accountant, and her husband had reported the following:

> No individual attendance records were kept
> No payroll records exist as [the Plaintiff] was not paid by Bella Boutique
> [The Plaintiff's] compensation from Bella Boutique was that household and personal expenses were paid out of the Bella Boutique Business account;
> No individual sales production records were kept
> No partnership agreement exists as Tennessee statute states husband and wife Partnerships are 50% in all aspects of business operation and income allocation.

The Defendant concluded that the issues to be addressed included the following:

> 1. Whether or not you were an Active Full time Employee being paid for such work in accordance with applicable wage and hour laws;
> 2. Whether or not you submitted Satisfactory Proof of Loss to support your basic monthly earnings as defined;
> 3. Whether or not your sickness or injury was the material and substantial factor in causing the earnings loss. A Sickness or

9

> Injury would not have a Demonstrated Relationship to a Disability if the earnings loss was produced primarily by causes which are not related to a Sickness or Injury;
> 4. Whether or not you meet the definition of Total Disability or Partial Disability through the Elimination Period and beyond; and
> 5. Whether or not you submitted Satisfactory Proof of Rehabilitative Employment earnings.

[Doc. 9-10 at 16].

*(c) The Plaintiff's Second Appeal*

The Plaintiff appealed the decision on March 3, 2014. [Doc. 9-9 at 85-86]. In support of her appeal, the Plaintiff submitted statements of six witnesses stating that the Plaintiff worked far more than 40 hours per week prior to her last day of work in May 2010. [Doc. 9-9 at 73].

In a letter dated October 1, 2014, the Defendant stated that the claim determination that the Plaintiff was not an Active Full-time Employee prior to her May 11, 2010, claimed date of disability was overturned. [Doc. 9-8 at 55]. The Defendant noted that it had received an 8GB flash drive that included video statements of the Plaintiff, the Plaintiff's husband, and several other witnesses. [Doc. 9-8 at 55]. The Defendant noted that the Plaintiff's report regarding her attendance was consistent with the audio statements with the witnesses. [Doc. 9-8 at 55]. The Defendant, continued, however that two of the statements were made by family members and that two other statements were made by employees that were not working at Bella Boutique on or around the claimed disability date in May 2010. [Doc. 9-8 at 55]. The Defendant noted that it requested additional information, and the Plaintiff provided additional information. [Doc. 9-8 at 55]. The Defendant concluded that based on multiple witnesses who attested to the Plaintiff's work attendance, the Defendant granted the Plaintiff's appeal with respect to its decision that the Plaintiff was not an Active Full-time Employee. [Doc. 9-8 at 55].

The Defendant continued that the matter regarding the Plaintiff's eligibility for Total Disability or Partial Disability benefits required additional review. [Doc. 9-8 at 55]. The Defendant noted that it conducted research regarding the Plaintiff's involvement in the operation of Bella Boutique and that the information obtained included the Plaintiff's posts to Facebook. [Doc. 9-8 at 55]. The Defendant stated that the Plaintiff appeared to be performing marketing/merchandising duties. [Doc. 9-8 at 55]. The Defendant then proceeded to list all the Facebook postings by the Plaintiff. [Doc. 9-8 at 56]. In addition, the Defendant referenced Mr. Bannon's September 11, 2014 letter, and noted the following: (1) the Plaintiff did not incur a loss of earnings in 2010 or 2011 but did incur a loss of earnings in January 2012, and therefore, would not be eligible for Partial Disability benefits until January 2012; (2) the information provided does not support that the Plaintiff was an Active Full-time Employee prior to the date of disability of January 1, 2012, and the Plaintiff's coverage under the Plan would have terminated; and (3) the information would support the Plaintiff's involvement in the business but does not establish that the Plaintiff was performing all of her duties of her job working at least working 30 hours per week [sic]. [Doc. 9-8 at 57]. The Defendant concluded:

> In summary, the information reviewed on appeal establishes Ms. Buchanan as an Active Full-Time Employee prior to her claimed date of disability in May 2010. However, based on the additional information provided and contractual provisions as cited above, I must upon appeal agree with the prior handling of Ms. Buchanan's claim, and support the decision reached that Ms. Buchanan was not eligible for Partial Disability benefits as her earning[s] were not at least 20% less her Basic Monthly Earnings for years 2010 and 2011. Additionally, it is determined that Ms. Buchanan's coverage under the insurance was terminated prior to the date of disability in January 2012. Therefore, in reviewing the appeal, we must affirm the determination that was previously reached on the claim regarding Ms. Buchanan's Partial Disability.
>
> The administrative remedy of appeal under this policy regarding Ms. Buchanan's eligibility for Partial Disability benefits in 2010 and

11

> 2011 is now exhausted, and the administrative record of the claim regarding the matter is now closed.
>
> However, Sun Life's determination regarding Ms. Buchanan's eligibility for Partial Disability benefits commencing January 1, 2012, differs from the previous claim decisions. Therefore, Ms. Buchanan retains her rights to an additional remedy of appeal regarding a claim for benefits with a date of disability of January 1, 2012. Please refer to the following information should Ms. Buchanan choose to exercise her additional appeal rights.

[Doc. 9-8 at 58-59].

### *(d) The Plaintiff's Third Appeal*

In a letter dated December 16, 2014, the Plaintiff stated that she had appealed the decision. [Doc. 16 at 1]. The Plaintiff stated that in support of her appeal, she attached several statements from employees addressing the Facebook posts of Bella Boutique. [Doc. 16 at 1]. The Plaintiff also stated that she included statements from herself and her husband. [Doc. 16 at 1]. The Plaintiff submitted that the employees had access to the Facebook page and made the entries, not the Plaintiff. [Doc. 16 at 1]. Subsequently, on December 30, 2014, the Plaintiff sent the Defendant a thumb drive with video statements of the Plaintiff and Plaintiff's husband regarding the Facebook posts. [Doc. 16 at 9].

Later, in a letter dated February 10, 2015, the Defendant stated that the administrative remedy for disability benefits for the years 2010 and 2011 had been exhausted and the administrative record had been closed. [Doc. 16 at 11]. The Defendant noted that the only appeal remedy available to the Plaintiff pertained to eligibility for benefits for a Period of Disability commencing on or after January 1, 2012. [Doc. 16 at 10].

## II. POSITIONS OF THE PARTIES

The parties have filed competing dispositive motions. Because the Defendant filed its Motion first, the Court will begin with the Defendant's position.

*(a) Defendant's Motion for Summary Judgment on the ERISA Record*

The Defendant argues that the denial of benefits was not arbitrary and capricious. The Defendant submits that the Plaintiff is not able to satisfy the requirements for either total or partial disability. The Defendant states that after the Plaintiff allegedly stopped working, she continued to sign the vast majority of checks. In addition, the Defendant argues that she continued to market the business, such as writing posts on social media between September 2010 and January 2013. The Defendant asserts that the Plaintiff continued to perform one, if not more, of the substantial and material duties of her occupation. Further, the Defendant argues that the denial of partial disability benefits is not arbitrary and capricious. The Defendant submits that to receive partial disability benefits, the Plaintiff must prove that she was still earnings at least 20% less than her Pre-Disability earnings immediately prior to the onset of Disability and there is a Demonstrated Relationship between the earnings loss and the current disability. The Defendant submits that the Plaintiff's earnings increased in both 2010 and 2011. Finally, the Defendant argues that the Plaintiff was ineligible for coverage under the policy in 2012 because the coverage is only available for active, full time employees and the Plaintiff stopped working full-time in 2010 when she submitted her claim for disability benefits.

*(b) The Plaintiff's Motion for Judgment on the Administrative Record*

The Plaintiff argues that the applicable Policy grants discretionary authority to GE Group Life Assurance Company and that the Defendant made the initial claim determination before it had issued its new certificate of insurance. The Plaintiff argues that because an entity that was not granted discretionary authority made the claim determination in this case, the *de novo* standard of review applies.

In addition, the Plaintiff submits that the Defendant first denied disability benefits because it asserted that the Plaintiff did not qualify as an Active Full-time Employee as defined by the Policy and that in its second denial, it changed its rationale by asserting that the Plaintiff was not disabled under the Policy because she performed at least one of her material duties. The Plaintiff states that she should have had an opportunity to address the new denial. The Plaintiff argues that she attempted to appeal the decision by sending correspondence of additional proof, but the Defendant refused to consider the additional proof. The Plaintiff asserts that the video and the written statements show that she was not performing material and substantial duties at her employment or at any employment. The Plaintiff submits that she did not receive a full and fair review.

As mentioned above, the Court heard oral arguments on January 11, 2017. Subsequently, the Plaintiff a Supplemental Brief [Doc. 29], and the Defendant responded [Doc. 30]. The Court has considered the additional briefs.

### III. STANDARD OF REVIEW

Where a benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's benefit determination is reviewed "under the highly deferential arbitrary and capricious standard of review." Goetz v. Greater Georgia Live Ins. Co., 649 F. Supp. 2d 802, 811 (E.D. Tenn. 2009) (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 168 (6th Cir. 2003) (internal quotation marks removed)).

If it is possible to offer a "reasoned explanation" for the decision, based on all the evidence known to the administrator, then the decision is not arbitrary and capricious. Hunter v. Caliber System, Inc., 220 F.3d 702 (6th Cir. 2000); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d

376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 169, 172 (6th Cir. 2003). Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 667 (6th Cir. 2006).

Moreover, the Court is to limit its review to the administrative record. Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998); Wilkins v. Baptist Healthcare Sys., 150 F.3d 609, 613 (6th Cir. 1998).

The parties dispute as to whether the arbitrary and capricious standard of review applies in this case. The Plaintiff argues that the applicable Policy grants discretionary authority to GE Group Life Assurance Company. The Plaintiff states that Defendant Sun Life issued its new certificate of insurance after it made the initial claim determination on February 14, 2012. Thus, the Plaintiff submits that Defendant Sun Life, which was not granted discretionary authority, made the decision and that the *de novo* standard of review is applicable.

During the hearing, the Defendant argued that GE Group Life Assurance Company issued the original Policy but that the company went through a series of name changes and is now known as Sun Life and Health Insurance Company (U.S.).

The Court finds that the arbitrary and capricious standard applies. A similar argument was raised in Ray v. Sun Life & Health Ins. Co., 443 F. App'x 529, 531 n. 2 (11th Cir. 2011). In Ray, the plaintiff argued that when a change occurred in the insurance company acting as claims fiduciary, the grant of discretionary authority to the original company, GE Group Life Assurance

15

Company, does not transfer to the new company, Sun Life. Id. at 530, n.2. The court disagreed and noted that the plaintiff offered nothing to dispute that the entity first known as GE Group Life Assurance Company is the same entity now known as Sun Life. Id. Accordingly, the Court finds the Plaintiff's argument not well-taken and that the arbitrary and capricious standard applies.

The Defendant, acknowledges, however, that a conflict of interest exists in this case. A conflict of interest will arise when the decision-maker of which claims are covered is also the payor of those claims. Calvert v. Firstar Finance, Inc., 409 F.3d 286, 292-93 (6th Cir. 2005); Marks v. Newcourt Credit Group, 342 F.3d 444, 457 (6th Cir. 2003). It is well-established that the standard of review—that is, arbitrary and capricious—will not change because of a conflict of interest. Calvert, 409 F.3d 286, 292-93; see also Myers v. Prudential Ins. Co. of Am., 581 F. Supp. 2d 904, 909-10 (E.D. Tenn. 2008) (discussing Calvert). However, a conflict of interest is a factor to consider when determining whether the plan administrator's denial of benefits was arbitrary and capricious. Calvert, 409 F.3d at 292-93. Accordingly, the Court will consider this conflict of interest in its analysis below.

## IV. ANALYSIS

As an initial matter, during the hearing, the Defendant withdrew its argument regarding the social media posts and emphasized that the issue was whether the Plaintiff was still writing checks. In addition, the Plaintiff argued that she was not claiming partial disability. Thus, the primary issue before the Court is whether the Defendant's decision to deny the Plaintiff's claim for total disability was arbitrary and capricious.

The Court finds that the Defendant's decision to deny benefits was not arbitrary and capricious. As explained above, the Defendant originally denied the Plaintiff's claim because her financial documents showed that all income was allocated to her husband—she simply had no

16

reported earnings. Later, however, the Defendant revised the Policy in order to add a definition for "Basic Monthly Earnings" that could be applied to partnerships. In determining whether the Plaintiff met the amended definition, the Defendant sent Plaintiff's financial information to Mr. Bannon, a CPA. Mr. Bannon noted as follows:

> Ms. Buchanan has submitted copies of the business bank statements and canceled checks from June 2009 through June 2013. There were approximately 110 to 120 checks clearing the bank each month. While it is not possible to determine her monthly Rehabilitative Earnings from the bank statements, the canceled checks do indicate that Ms. Buchanan has been continually involved in the operation of the business. This is clearly evidenced by the fact that the vast majority of the 110 to 120 monthly checks were signed by Ms. Buchanan. At a minimum, this reflects an ongoing financial/managerial participation in the business.

[Doc. 9-10 at 9]. Based on this finding, in a letter dated September 24, 2013, the Defendant affirmed the denial of Plaintiff's claim stating that the Plaintiff was not totally disabled. The Defendant explained the definition of "Total Disability," which provides, in relevant part, that the individual is unable to perform all the material and substantial duties of the Regular Occupation. [Doc. 9-10 at 1]. In addition, the Defendant noted that it had previously explained that whether the Plaintiff was totally disabled was an issue that needed to be addressed. The Defendant explained that the Plaintiff submitted copies of checks from June 2009 through June 2013 and that vast majority of the 110 to 120 monthly checks were signed by the Plaintiff. [Doc. 9-9 at 98]. The Defendant noted, "With respect to determining Total Disability versus Partial Disability, the Bella Boutique Accounts Payable Check copies continued beyond the claimed May 11, 2010, Total Disability date, throughout the 90-Day Elimination Period, and up through recent submission suggesting that you continued to perform at least one of the material duties of your Regular or any Occupation on a Full-time or Part-time Basis. [Doc. 9-10 at 5]. The Court finds the Defendant's decision to be reasonable in light of the Plaintiff stating that her job duties included bookkeeping

(i.e., writing all business expenses checks, paying all vendors' invoices in a timely manner, and so forth). [Doc. 9-10 at 54].

However, despite the Defendant specifically referencing the check writing and stating that it appeared the Plaintiff was still performing a material duty, the Plaintiff did not address the issue on administrative appeal. The Plaintiff simply did not, and has not, denied Mr. Bannon's statement. See Flatt v. Aetna Life Ins. Co. of Hartford, Conn., No. 3:13-cv-0839, 2015 WL 5944365, *15 (W.D. Tenn. Oct. 13, 2015) ("The claimant bears the burden of proving that the administrator's decision was arbitrary and capricious.").

For instance, the Plaintiff submitted to the Court the material that the Defendant did not consider because the appeal process had been exhausted. The Court has reviewed the documents and the statements and finds that the Plaintiff still has not directly answered whether she was still writing checks. In a video statement, when asked by her attorney whether she was signing checks, she replied that she can pick up a pen. When her husband was asked whether the Plaintiff had signed checks from time to time, he states, "Checks that were signed—we had given employees permission. Some were signed by employees." These statements do not deny that the vast majority of the 110 to 120 monthly checks were signed by the Plaintiff, which reflects an ongoing financial participation in the business. Further, at the hearing, the Plaintiff was given multiple opportunities to point to any evidence in the record that explained the check writing. The Plaintiff repeatedly stated that employees were given permission to sign checks. The Court notes, however, that this does not mean that the employees actually did sign checks, nor does it directly answer the question. Accordingly, the Court finds that the Defendant offered a reasoned explanation based on its evidence that the Plaintiff was not totally disabled per the terms of the Policy and the Court recommends that the Plaintiff's Motion be denied.

## V. CONCLUSION

Accordingly, the undersigned **RECOMMENDS**[3] that the Defendant's Motion for Summary Judgment on the ERISA Record [**Doc. 17**] be **GRANTED** and the Plaintiff's Motion for Judgment as a Matter of Law on the Administrative Record [**Doc. 19**] be **DENIED**.

Respectfully Submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).